# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

CAMIA TIFFANY GAMET,

      Defendant-Appellant.

UNPUBLISHED
February 11, 2016

No. 324181
Jackson Circuit Court
LC No. 13-004504-FC

Before: BOONSTRA, P.J., and K. F. KELLY and MURRAY, JJ.

PER CURIAM.

A jury found defendant guilty of first-degree murder, MCL 750.316, and she was sentenced to mandatory life imprisonment without parole. She appeals as of right. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS

On May 18, 2013 at approximately 3:00 a.m., several 911 calls from the same number alerted police to 714 Lansing Avenue, Apartment 2. The caller advised that a man was bleeding.[1] When police arrived at the apartment, it was obvious that a struggle had taken place in the living room; chairs were knocked over, lamps were broken and the apartment looked "completely ransacked." The victim was found dead on a deflated air mattress on the floor. Officers asked dispatch to "ping" the 911 caller's cell phone, which led to defendant's arrest. Although defendant told officers that she was on her way home from a friend's house, they noticed that there was blood on her shoes. Defendant did not have a cell phone on her, but officers located the cell phone and battery in the area of 714 Lansing with help from the canine unit; the cover for the phone was missing and was later found in defendant's bra. Defendant was not visibly injured except for a small cut on her left hand. She had cuts and dried blood on the bottom of her feet.

Michelle Winters lived in the apartment right below the victim and defendant. They had only lived there for approximately two weeks before the victim was murdered. Winters worked

---

[1] The calls were played for the jury.

nights but was still able to hear the victim and defendant fight. One time Winters heard defendant say to the victim, "go ahead and hit me," but Winters never saw the victim strike defendant. One time their fighting caused damage to Winters' apartment. When Winters confronted them, the victim apologized and said that they were probably going to be evicted anyway. On the day before he was murdered, the victim asked Winters to come and look at how clean his apartment was. He borrowed Winters' phone because defendant had taken his. Winters overheard the victim tell someone that he hated that "f****ing b****."

Melissa Olmstead testified that she lived in a studio apartment right across from where the victim and defendant lived. The victim had moved into his apartment and defendant moved in with him approximately one week before he was murdered. The victim was nice "but mentally challenged." Olmstead woke up on May 18th at approximately 1:30 a.m. thinking that someone was breaking into her house because she could hear glass breaking. When Olmstead looked out her window into the victim's apartment she could see defendant throwing dishes at the victim. The victim was slouched on the floor with his arms in front of his face screaming "stop hitting me." This went on for about an hour. Olmstead saw defendant get a glass of water and then turn the lights off. She did not appear to be injured or upset.

The medical examiner testified that the victim had therapeutic levels of a number of drugs in his system, as well as marijuana, cocaine and alcohol. The victim had 11 sharp force injuries to his head, chest, back and arms. One of the stab wounds hit his heart and perforated his lung, causing blood to leak into his chest cavity. Another of the wounds was to the victim's back and also perforated the lung. There were a total of three wounds to the back of the victim's body. The victim also suffered from blunt force trauma. There was a gaping laceration above his right eye. There was also a gaping laceration to the back of the victim's head. There were at least two injuries to the back of the victim's head. The victim also had defensive wounds. The cause of death was multiple sharp force and blunt force injuries and the manner of death was homicide.

There was evidence regarding the parties' relatively brief, though tumultuous relationship. Jackson Police Officer Matthew William Beard testified that he had previous contact with defendant and the victim on New Year's Eve of 2012. Defendant had called 911 a number of times that weekend but the victim left the scene before police arrived. But on that New Year's night, both of them were present. They appeared to be hot and sweaty and both had minor injuries. Defendant reported that she held the victim down so he could not leave before police arrived. Defendant appeared to be the stronger of the two. Neither were prosecuted.

Dr. Karen Gilbert testified that she treated the victim for a head injury on March 8, 2013. The victim reported that his girlfriend had hit him in the back of the head with a hammer. He needed staples, but did not have internal injuries. Gilbert noted that the victim had also been treated at the hospital on March 3, 2013 for a collapsed lung and sutures to his chest. The victim told Gilbert that the prior injury was from a stab wound. The victim told the previous treating physician that the wound was from a fall down the stairs and landing on a nail.

Barbara Johnson testified that the victim was her younger cousin. The victim was "behind" and "a little slower." He also walked differently – by kicking forward like a horse. Johnson described the victim as "like a child." On March 8, 2013 the victim came to Johnson's

house and reported that defendant had hit him in the head with a hammer. Johnson took the victim to give a written statement to police. The statement read: "She [defendant] came in around or about 4:00 a.m. She was high on crack and drunk on alcohol. When I told her to leave, because she was starting a false argument, she has been calling the police and using an alias of Ashley Jones, number 517-612-4799.[2] This is the number she has called from and she'll take the battery out of the phone. I am very afraid of Camia Gamet. She has assaulted me tonight with a hammer. . . .She has hit me in the head . . . I asked her to leave and she wouldn't, so I left and made contact with my cousin, Barbara Ann Johnson." The victim signed the statement and, in his own handwriting, wrote "I want to press charges." Johnson warned the victim after the hammer incident that defendant was going to kill him. Johnson testified that on one occasion in the summer of 2012, she saw the victim rip off defendant's shirt.

The officer who responded to the victim's complaint regarding the hammer incident found defendant at the apartment, passed out and incoherent. A hammer was lying next to her that had blood on it. Defendant reported that the victim had come at her and she was defending herself. The case against defendant was ultimately dismissed because the victim wrote a letter indicating that he could not be sure that it was defendant that had hit him with a hammer.

Diana Banks-Joiner testified that the victim was her nephew and she helped raise him. The victim had mental problems and had a hard time keeping up with Banks-Joiner's other children. He suffered from fetal alcohol syndrome and scoliosis, which made him walk differently. The victim attended special education classes and graduated from high school. He received SSI but also tried to work. The victim did not have trouble with his bank account until he met defendant, at which time he would be overdrawn on his account. Banks-Joiner believed defendant controlled the victim.

Banks-Joiner testified that she saw the victim suffer from a number of injuries once he began seeing defendant. She also testified that the victim told her that defendant had stabbed him in the abdomen and then sewn the wound shut with thread. Defendant casually noted that she had not intended to cut the victim that deeply. On another occasion, defendant punctured the victim's lung and recorded hospital footage of a doctor treating the victim. Banks-Joiner told the victim "this girl is going to kill you and you need to get away from her." Two weeks before he died, the victim called Banks-Joiner and said he was afraid of defendant. In a phone conversation, Banks-Joiner asked defendant if she was planning on killing the victim; the victim was dead the next day.

Sharmika March was Banks-Joiner's daughter and the victim's cousin. March testified that the victim was cognitively impaired and "struggled with everyday perception" and living independently. He always needed assistance with everyday things. He had scoliosis and also suffered from meningitis. He walked "funny." March testified that "[y]ou could look at him and tell that there may be some things wrong with him." The victim had a large head and his eyes were far apart. At one point, March was his payee. The victim only had to pay four bills a month, but could not pay them all at once because it was overwhelming. March would have to

---

[2] Police records indicated that defendant used the alias of Ashley Jones.

tell him, "pay these two today." The victim could do it if the task was broken into parts and he could feel a sense of pride. In the spring of 2013, the victim asserted that he wanted control of his own money. The office approved it, but March did not agree with that decision. Defendant became the victim's "chore provider" in August 2012, entitling her to some of his SSI benefits. The victim had written a letter to terminate defendant as his chore provider shortly after the hammer incident, but then reneged on the letter almost immediately after defendant posted bond. After his death, March learned that the victim had been taking payday loans.

When the victim started seeing defendant, March was worried: "I had concerns with someone who presented so well what her motive was with someone of his stature." There was definitely a "mismatch." March noticed injuries on the victim after he began his relationship with defendant, which the victim would laugh off. After the injury to his head, the victim was admitted to a facility for suicidal thoughts. March was particularly disturbed when she confronted the victim about the hammer attack because the victim said that if defendant wanted to really hurt him or kill him she would have just kept hitting him. Like the others, March warned the victim that defendant would kill him one day.

The victim had been attending New Vision to work on life goals, including mental health appointments and PT for his scoliosis. His case manager, Sheila Lorenz, testified that the victim had a borderline IQ. He walked with a cane and had a limp. He received SSI for cognitive impairment. Lorenz testified that she questioned the match between the victim and defendant, but that the victim craved "normalcy," which included having a girlfriend. The victim reported that he and defendant argued and, on one occasion, showed Lorenz where defendant had stabbed him and sewn him up. He also reported another incident where defendant stabbed him and he had to go to the hospital. The victim reported a third incident in which defendant hit him in the head with a hammer. The victim told Lorenz that defendant loved him and did not want him to leave. Lorenz warned the victim that if the relationship continued, defendant would kill the victim.

The lead detective on the case, Gary Schuette, testified regarding the dispute between the victim and defendant on the night of the murder. Officers were called out to the bar more than once. They were fighting over a key and the fact that the victim wanted defendant to return home with him because defendant was drinking too much. No arrests were made. Schuette interviewed defendant about the murder and her statement was played for the jury. Defendant's name was on the mailbox and she had a library card there, establishing residence. Defendant denied knowing anything about how the victim was killed. She denied any wrongdoing.

Schuette testified that defendant had a prior conviction in Ohio for domestic violence. Defendant made threatening calls to kill a former boyfriend. Defendant was arrested a few weeks later in May 2007 for attempting to assault her boyfriend with a fire extinguisher. Defendant allegedly picked up her six week old baby in a car seat and threw it at him.

Alfred Cavasin testified that he was a private investigator hired by defense counsel. When Cavasin interviewed defendant in January 2014, she told him that on the night in question, she and the victim had been drinking and using drugs. She went out and got them food and when she returned the victim was angry. Defendant went to bed and the next thing she remembered was a glass table being broken above her head. She reached for her purse to call 911 or for the

lamp to turn a light on. She swung the lamp around. Defendant then felt a knife on the floor. She stabbed until the attack was over. When she turned on a light, she realized that the victim was dead. She called 911 a number of times while hiding out of sight.

Following an unsuccessful motion for a directed verdict, defendant presented her own witnesses. Derek Drummond testified that he and defendant had children together. He was the victim in defendant's prior Ohio court cases on April 18, 2007 and May 2, 2007, but testified that he was the one who beat defendant on those occasions. He denied that defendant ever harmed or threw their children. He indicated that the individual who made the accusation had a vendetta against defendant. Drummond testified that he beat defendant "the whole time" they were together, which was approximately two and a half years.

Defendant testified that she was 31 years old. Defendant was originally born in Jackson, Michigan, but was removed from her parents' care. She spent much of her life in foster care and juvenile homes in Iowa until she was 16, at which time she returned to Michigan in an attempt to make contact with her biological family. It was at that time that she met the victim. He bought cocaine at a house where she used to stay. Defendant left Michigan again and returned a number of years later. In June 2012, she saw defendant riding his bicycle and recognized him. Although they were not "together," defendant moved in with the victim very shortly after reconnecting. With the exception of one month the victim spent at rehab, they lived together continuously. They drank on a daily basis. They also did drugs. Defendant testified that she had post-traumatic stress disorder, major depression, bipolar disorder, ADHD, and anti-social personality disorder. She had a case manager at Segue.

Defendant testified that she and the victim had a "rocky" relationship but they were planning on getting married and defendant was dedicated to the relationship. Defendant testified regarding an incident at the victim's cousin's house where he had been drinking. The victim was cursing and calling defendant names. He punched her and she slapped him. On the night of the murder, the two of them had been using drugs and drinking. She and the victim had fought earlier in the day. Other than coming home and giving the victim some food and then going to bed, defendant had no recollection of the remainder of the events that took place earlier in the day. Defendant went to bed on the inflatable mattress. Defendant woke up "to the sound of glass shattering over my head." It was "pitch black" in the room. Defendant was startled and confused and could feel "someone" hitting her repeatedly in the back of her head. Defendant jumped up and reached for the lamp. The lamp came apart in her hands, so she began to swing it. Defendant fell on her knees and was feeling around for her purse and cell phone when her hand touched the knife she had used to hang up curtains. At one point, defendant heard a voice say, "B****, I'm going to kill you." Defendant was scared because she did not recognize the voice. The person was still striking defendant so she struck out with the knife several times. The person fell, defendant dropped the knife, and then went to find a light source. After turning on the bathroom light, she saw that it was the victim. She tried yelling his name and then went outside to call 911. She had to call four times. Defendant explained that she did not tell 911 her name because she "realized that something serious had happened and after I saw that it was him I wanted to help him." Defendant dropped the phone and was trying to find it, but was too drunk. Defendant denied knowing the victim was dead before she left the apartment.

Defendant remembered being arrested and taken to the police station and sleeping for hours. Her feet were bleeding from cuts she sustained in the apartment. Her legs were also cut and she had "a little bit of injuries on [her] arms." No one ever checked her or treated her for her injuries. Defendant admitted that she was not honest during her interrogation. She explained: "I kept telling him I wanted to leave because I wanted to see if Marcel was okay, so I was trying to tell [the detective] something in order for him to let me leave." Once she heard that the victim was dead, defendant was "heartbroken" and in "denial." Defendant explained that she threw the table and chairs in the interrogation room because she was drunk and upset. Defendant's motto was "you don't talk to police," and, had defendant not been drunk, she would not have spoken to the officer.

Defendant testified that her only source of income was as the victim's chore provider. The victim removed defendant as his chore provider a few months earlier. He was in the process of reappointing her his chore provider when he died. She was not his payee and never had authority over his accounts. Defendant testified that the victim "did not have any physical limitations" and "was far from cognitively delayed or anything of that sort."

Defendant denied hitting the victim in the head with a hammer in March 2013: "I do not know how he received his injuries to his head as he did not know. Which is why the case was dismissed." Defendant also denied previously stabbing the victim: "The injury that [the victim] received he had to receive a chest tube and those were the threads that he was showing people and saying that I stitched up." She believed the victim received the wound when he fell down the stairs.

The jury convicted defendant of first-degree murder. Defendant was sentenced to life without parole. She now appeals as of right.

## II. DEFENDANT'S MAIN BRIEF

### A. SUFFICIENCY OF THE EVIDENCE

Defendant argues that the evidence was insufficient to support her murder conviction. We disagree.

"We review de novo a challenge on appeal to the sufficiency of the evidence." *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010). "Taking the evidence in the light most favorable to the prosecution, the question on appeal is whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Hardiman*, 466 Mich 417, 421; 646 NW2d 158 (2002). "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *Id.* at 428.

Defendant was charged with open murder and convicted of first-degree murder. "The elements of first-degree murder are (1) the intentional killing of a human (2) with premeditation and deliberation." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010). Here, there is no question that defendant killed the victim. However, defendant argues that the prosecution failed to present evidence of planning, deliberation or premeditation where the

victim's death occurred during a drug-induced struggle. Defendant maintains that she acted in the heat of the situation.

"Intent may be inferred from all the facts and circumstances," *People v Cameron*, 291 Mich App 599, 615; 806 NW2d 371 (2011), and "the intent to kill may be inferred from any facts in evidence." *People v Unger*, 278 Mich App 210, 223; 749 NW2d 272 (2008). Likewise, "premeditation and deliberation may be inferred from the circumstances surrounding the killing." *Unger*, 278 Mich App at 229, quoting *People v Anderson*, 209 Mich App 527, 537; 531 NW2d 780 (1995). Our Court has held:

> Premeditation may be established through evidence of (1) the prior relationship of the parties, (2) the defendant's actions before the killing, (3) the circumstances of the killing itself, and (4) the defendant's conduct after the homicide. Some time span between the initial homicidal intent and the ultimate killing is necessary to establish premeditation and deliberation. However, the time required need only be long enough to allow the defendant to take a second look. Circumstantial evidence and reasonable inferences drawn from the evidence may constitute satisfactory proof of premeditation and deliberation. [*Unger*, 278 Mich App at 229 (internal citations and quotation marks omitted).]

The victim's injuries alone indicate that his death was deliberate. Defendant had attacked the victim on prior occasions, which included stabbing the victim and striking him with a hammer. The autopsy revealed that the victim had been stabbed at least 11 times. Some of these wounds were on the back of the victim's body. The victim also suffered a number of defensive wounds. In addition to the stab wounds, there was evidence that the victim suffered from blunt force trauma. Defendant admitted to striking the victim with both the lamp and a knife. Even if defendant's version of events were true and she awoke to being attacked, we agree with the trial court's statement in response to defendant's motion for directed verdict: "[T]here is evidence that, number one, at least two or three separate striking weapons may have been used, and of course, a large knife that was used multiple different times, so really, there would be that window for the defendant to allegedly reflect upon the final consequences of the outcome of the crime, that being first degree premeditated murder."

As part of her sufficiency argument, defendant claims that the trial court erred in failing to instruct the jury that it could find defendant guilty of voluntary manslaughter. Although defendant did not properly state this issue in her statement of questions presented, we will nevertheless address it, as it was also raised in her Standard 4 brief.

"[J]ury instructions that involve questions of law are also reviewed de novo. But a trial court's determination whether a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion." *People v Gillis*, 474 Mich 105, 113; 712 NW2d 419 (2006) (internal quotation marks and citation omitted).

"Challenges to jury instructions are considered in their entirety to determine whether the trial court committed error requiring reversal." *People v Eisen*, 296 Mich App 326, 330; 820 NW2d 229 (2012). "Jury instructions must clearly present the case and the applicable law to the jury. The instructions must include all elements of the charged offenses and any material issues,

defenses, and theories *if supported by the evidence.*" *People v McGhee*, 268 Mich App 600, 606; 709 NW2d 595 (2005) (emphasis added, internal citation omitted). Therefore, "when a jury instruction is requested on any theories or defenses and is supported by evidence, it must be given to the jury by the trial judge." *People v Mills*, 450 Mich 61, 80-81; 537 NW2d 909, modified on other grounds 450 Mich 1212 (1995). However, a trial court is not required to give a requested instruction "where the theory is not supported by evidence." *Id.* In the event of an instructional error, a defendant must "demonstrate that it is more probable than not that the failure to give the requested lesser included misdemeanor instruction undermined reliability in the verdict." *People v Cornell*, 466 Mich 335, 364; 646 NW2d 127 (2002).

At trial, defense counsel argued that a manslaughter instruction was appropriate where defendant was being attacked and struck out at her attacker. He argued that the record was devoid of any evidence that defendant plotted to murder the victim.

> [T]o show voluntary manslaughter, one must show that the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions. Significantly, provocation is not an element of voluntary manslaughter. Rather, provocation is the circumstance that negates the presence of malice. [*People v Reese*, 491 Mich 127, 143-44; 815 NW2d 85 (2012), quoting *People v Mendoza*, 468 Mich 527, 535-536; 664 NW2d 685 (2003).]

Therefore, to support a jury instruction for voluntary manslaughter, the evidence must show that defendant killed in the heat of passion caused by adequate provocation and there was not a lapse of time during which a reasonable person could control her passions. The trial court properly declined to give a voluntary manslaughter instruction for the same reasons the evidence was sufficient to support defendant's first-degree murder conviction. The victim suffered 11 stab wounds and numerous blows to the head. The medical examiner testified that there was more than one fatal injury inflicted. Even if the conflict began as defendant testified, there was clearly enough time for her to control her passions. Additionally, even if the jury should have been instructed on voluntary manslaughter, we deem any error harmless where the jury was instructed on self-defense and second-degree murder.

## B. DEFENDANT'S STATEMENT TO POLICE

Defendant next argues that the trial court erred in failing to suppress her statement to police. We disagree.

> This Court reviews de novo a trial court's ultimate decision on a motion to suppress evidence. Although this Court engages in a review de novo of the entire record, this Court will not disturb a trial court's factual findings with respect to a *Walker*[3] hearing unless those findings are clearly erroneous. [A] finding is clearly erroneous if it leaves us with a definite and firm conviction that the trial

---

[3] *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965).

court has made a mistake. [*People v Akins*, 259 Mich App 545, 563-64; 675 NW2d 863 (2003) (internal quotation marks, citations and footnotes omitted.]

Defendant argues that she was not in a position to waive her rights and make a statement because she was intoxicated and was deprived of food, sleep and medical attention for her injuries. The Michigan Supreme Court has held that:

> In determining whether a statement is voluntary, the trial court should consider, among other things, the following factors: the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

> The absence or presence of any one of these factors is not necessarily conclusive on the issue of voluntariness. The ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the [statement] indicates that it was freely and voluntarily made. [*People v Cipriano*, 431 Mich 315, 334; 429 NW2d 781 (1988).]

Officer Bradly Nicholas Elston testified that he was the one that stayed with defendant between the time she was arrested and the time she was interviewed. He testified that she was "kinda slow, sluggish . . .When I was speaking with her she was swaying, couldn't keep her balance, slurring her words, not speaking in a clear tone, clear voice." In the hour and a half it took for a detective to arrive, Elston did not provide defendant with any food.

Detective Schuette testified that other officers told him defendant had "an odor of intoxicants about [defendant]," so his first order of business was to determine defendant's level of intoxication. Defendant denied being intoxicated. She told Schuette that she had a few beers from a pitcher earlier in the night, but was not drunk. Defendant denied using any other drugs. Schuette testified:

> She did indicate to me that she was tired and cold, that – that she wanted to go home. I asked her if she would like to talk to me and requested that she talk to me, and she stated to me that she did want to talk to me, and it appeared to me at that point that she was not intoxicated, that she understood what I was asking. She understood what was going on, why she was there, and that she was willing to speak with me.

Schuette administered a breath test and defendant's results were .18 percent. He never administered a drug test. Schuette had been an officer since 1991 and felt comfortable talking to

defendant, even with a .18 level. Schuette acknowledged that, in his experience, someone with a .18 level might not have the "best judgment in the world."

Schuette reviewed defendant's Miranda rights and defendant signed the acknowledgment form. Schuette explained that he discussed the Advice of Rights form in a "simplistic" way in order to provide laymen's terms. Schuette wanted to make sure that defendant was able to understand what was going on before going forward.

Defendant told Schuette that she had completed tenth grade. Defendant did not appear off balance and did not make incoherent statements. Defendant did not believe that the victim was dead and continuously asked to see his body. After Schuette left the room, defendant cried and wailed. She went into the fetal position and then began to throw the table and chairs that were in the room.

The trial court denied defendant's motion to suppress:

I think that there's a difference between the police taking someone into custody that are [sic] drunk driving from a civil liability situation and it may be very different how they handle the situation when somebody is intoxicated, is at the, you know, police station.

So, and this – first of all, I'm gonna find based on the testimony that I think Detective Schuette gave a very thorough rendition of Miranda rights, I think the defendant showed clear cognizance of those rights. He went through them individually, she answered questions about her . . .education, other drugs that she'd had. She certainly didn't tell him that she was under the influence of anything else other than beer.

And – and in this case, you know, sometimes maybe you had a little bit too much to drink, maybe it lubricates somebody to talk to the police when maybe they shouldn't. But I think it goes to its weight, not its admissibility, therefore, the confession will be deemed admissible.

We agree. We have reviewed the taped interview and considered the totality of the circumstances. Defendant may have appeared tired and somewhat groggy, but she asked intelligent questions and gave no indication that she was unable to waive her rights due to extreme intoxication. The trial court did not abuse its discretion when it denied defendant's motion to suppress defendant's statement.

## C. OTHER ACTS EVIDENCE

Defendant next argues that the trial court abused its discretion when it allowed the prosecutor to admit prior domestic violence charges that were lodged against defendant in Ohio in 2007. We disagree.

This Court reviews for an abuse of discretion a trial court's decision to admit so-called bad acts evidence. *People v McGhee*, 268 Mich App 600, 636; 709 NW2d 595 (2005). A trial

court does not abuse its discretion when it chooses an outcome within the range of reasonable and principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003).

At trial, the prosecutor presented certified copies of defendant's convictions in Ohio. The prosecutor noted that the domestic violence statutes allowed prior acts of domestic violence. The trial court agreed. The first conviction was from April 2007. Defendant made threatening calls to kill a former boyfriend and was originally charged with domestic violence threats, but ultimately pleaded to disorderly conduct.[4] Defendant was arrested a few weeks later in May 2007 for attempting to assault her boyfriend with a fire extinguisher. Defendant also allegedly picked up her six week old baby in a car seat and threw it at him.

Generally, character evidence cannot be used to show that a defendant acted in conformity therewith because there is a danger that a defendant will be convicted solely upon her history of misconduct rather than on her conduct in a particular case. *People v Starr*, 457 Mich 490, 495; 577 NW2d 673 (1998). Generally, to be admissible under MRE 404(b), bad acts evidence (1) must be offered for a proper purpose, (2) must be relevant, and (3) must not have a probative value substantially outweighed by its potential for unfair prejudice. *People v Knox*, 469 Mich 502, 509; 674 NW2d 366 (2004). A proper purpose is one other than establishing the defendant's character to show her propensity to commit the offense. *People v Johnigan*, 265 Mich App 463, 465; 696 NW2d 725 (2005).

Defendant argues that the Ohio domestic violence incidents were admitted for the sole purpose of proving that defendant acted in conformity with that character on the night of the murder and should have been excluded under MRE 404(b). However, evidence of defendant's prior acts was admitted, not under MRE 404(b), but under MCL 768.27b, which provides:

> Except as provided in subsection (4) [conviction occurring more than 10 years before], in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other acts of domestic violence is admissible for *any* purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403. [Emphasis added.]

"Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the action more probable or less probable than it would be without the evidence." *People v Aldrich*, 246 Mich App 101, 114; 631 NW2d 67 (2001). Under this broad definition, evidence that is useful in shedding light on any material point is admissible. *Id.* at 114. "[P]rior-bad-acts evidence of domestic violence can be admitted at trial because a full and complete picture of a defendant's history tends to shed light on the likelihood that a given crime was committed." *People v Cameron*, 291 Mich App 599, 610; 806 NW2d 371 (2011).

---

[4] The trial court allowed Detective Schuette to testify regarding the records: "I don't think he's testifying to the veracity of the records, I just think he's looking at what he believes some of the underlying facts of the alleged – surrounding the alleged conviction."

However, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. MRE 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Our Court has indicated that "[t]he statutory language and policy considerations of MCL 768.27b clearly demonstrate the Michigan Legislature's intent to allow prior-bad-acts evidence to be introduced at trial as long as the evidence satisfies the 'more probative than prejudicial' balancing test of MRE 403." *Cameron*, 291 Mich App at 610.

Looking to MRE 403, the "prejudicial effect of other-acts evidence did not stir such passion as to divert the jury from rational consideration of [defendant's] guilt or innocence of the charged offenses." *Id.* at 611-612. The trial court also "minimized the prejudicial effect of the bad-acts evidence by instructing the jury that the issue in this case was whether [defendant] committed the charged offense." *Id.* Juries are presumed to follow their instructions. *People v Breidenbach*, 489 Mich 1, 13; 798 NW2d 738 (2011). Moreover, "any prejudicial effect of the trial court's decision to allow evidence of [defendant's] prior bad acts did not substantially outweigh the probative value of the evidence." *Cameron*, 291 Mich App at 612. Evidence of how defendant behaved with her prior domestic partner was clearly relevant to the prosecution's theory that defendant acted intentionally. The trial court did not err in admitting evidence of defendant's prior bad acts.

III. DEFENDANT'S STANDARD 4 BRIEF[5]

A. THE VICTIM'S PROPENSITY FOR VIOLENCE

In her Standard 4 Brief, defendant argues that the trial court abused its discretion when it excluded evidence of the victim's character for violence, especially where defendant claimed self-defense. We disagree.

MRE 404(a)(2) provides:

(a) Character evidence generally. Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

\*\*\*

(2) *Character of alleged victim of homicide.* When self-defense is an issue in a charge of homicide, evidence of a trait of character for aggression of the alleged victim of the crime offered by an accused, or evidence offered by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the alleged

---

[5] Defendant's Standard 4 Brief is not well-written with some issues overlapping and jumbled together. We have done our best to parse out the issues raised.

-12-

victim offered by the prosecution in a charge of homicide to rebut evidence that the alleged victim was the first aggressor.

MRE 405 then provides:

(a) Reputation or Opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into reports of relevant specific instances of conduct.

(b) Specific Instances of Conduct. In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct.

Our Supreme Court has explained:

As a general rule, the character of the victim may not be shown by specific instances of conduct unless those instances are independently admissible to show some matter apart from character as circumstantial evidence of the conduct of the victim on a particular occasion.

[W]hen character is not an essential element, it may be shown *only by reputation or opinion evidence* . . .Hence, construed literally, Rule 405 does not permit a defendant to use specific instances to show that the victim was the aggressor since the aggressive character of the victim is not an essential element of the defense of self-defense since the aggressive character of the victim is introduced as circumstantial evidence to show that the victim committed the first or primary *act* of aggression against the defendant, which is to say that the defense of self-defense in this situation makes an act of the victim, rather than a trait of the victim's character, the material issue. [1A Wigmore, Evidence (Tillers rev.), § 63.1, p. 1382–1383, n. 1.]

[*People v Harris*, 458 Mich 310, 319; 583 NW2d 680 (1998).]

At a motion hearing prior to trial, the trial court indicated that it was inclined to "allow each side to bring in the 404(b)'s. I mean, I don't think one side gets the domestic violence – gets to bring it in and the other side doesn't." But the trial court also agreed with the prosecutor that defendant could not simply rely on specific instances of conduct to prove the victim's character for aggression; instead, defendant would have to present reputation or opinion evidence:

I'm not just going to let in transcripts when there's actual victims [sic] that I think [the prosecutor's] totally correct, need to be produced in court. . . . so at this point in time, in the event that [defendant] puts in self-defense, then obviously, some of those other domestic acts, either under 404(a) or under 405(b), could be relevant, okay, or they could be admissible. So, I'm at least gonna probably allow

-13-

that to the extent that these victims and/or somebody with personal knowledge is gonna come up here and take the witness stand.

To that end, the trial court authorized $1,500 for defense counsel to hire a private investigator.

However, after trial began, the prosecutor asked the trial court to exclude all references to the victim's character in light of defendant's position that she did not even know who was attacking her, rendering the victim's character irrelevant. Trial court noted:

So in this case I asked if it's self-defense, and I guess your client – You're telling me that she doesn't know who she attacked, so if she doesn't know who she attacked, why are all these other events relevant in the trial? I mean, it would be one thing if you're going to tell me she knew it was the defendant.

\*\*\*

It would be one thing if she's going – you're going to tell me she's – she's going to try to argue she acted in self-defense, I'll rule your way. But if you're going to tell me she thinks it's some intruder who she doesn't even know, I don't know why all this other stuff's relevant.

\*\*\*

[I]t could be the random cat burglar then, right? So then if that's the case then none of this evidence is legally or logically relevant, because if your client doesn't know who it is, then all these other evidence, the unconvicted bad acts of the defendant [sic], I'm going to find that their prejudicial impact would overweigh their probative value and I'm not allowing the evidence.

Now, you might want to talk to your client for a minute and find out if that's really the defense you want to advance.

After a recess, defense counsel indicated that defendant would be testifying and was steadfast in how she wanted to proceed. She continued to maintain that she did not know who was attacking her.

In light of defendant's theory of the case, the trial court did not abuse its discretion in excluding evidence of specific acts of violence by the victim. "In Michigan, the killing of another person in self-defense is justifiable homicide if the defendant honestly and reasonably believes that his life is in imminent danger or that there is a threat of serious bodily harm." *People v Heflin*, 434 Mich 482, 502; 456 NW2d 10 (1990). Defendant's knowledge of the victim's character for violence was simply irrelevant because she believed she was being attacked by a stranger.

## B. IMPERMISSIBLE HEARSAY EVIDENCE

Defendant next argues that the trial court erred in allowing inadmissible hearsay evidence to be admitted throughout trial. We disagree.

-14-

## 1. DR. KAREN GILBERT

Over defense counsel's hearsay objection, Dr. Karen Gilbert testified that she treated the victim for a head injury on March 8, 2013. The victim reported that his girlfriend had hit him in the back of the head with a hammer. He needed staples, but did not have internal injuries. Gilbert noted that the victim had also been treated at the hospital on March 3, 2013 for a collapsed lung and sutures to his chest. The victim told Gilbert that those were from a previous stab wound, although the victim had told the previous treating physician that the wound was from a fall down the stairs and landing on a nail. In justifying its earlier ruling, the trial court added: "I just want to clarify for the Record, MRE 803(4) provides for the admissibility of certain statements made in subjective contemplation of medical treatment or diagnosis in connection with treatment that the out-of-court declarant must subjectively believe that the statement is being made in anticipation of treatment, treatment or diagnosis. And certainly the court, when understanding the testimony, believed that Marcel was certainly there for those purposes."

The trial court was correct. MRE 803(4) provides that the following is not excluded by the hearsay rule:

> (4) Statements Made for Purposes of Medical Treatment or Medical Diagnosis in Connection with Treatment. Statements made for purposes of medical treatment or medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably necessary to such diagnosis and treatment.

## 2. BARBARA JOHNSON

Over defense counsel's objection, Johnson testified that her cousin came to her home on March 8, 2013 and reported that defendant had hit him in the head with a hammer. The trial court overruled defense counsel's objection without much comment, but the prosecutor had argued both forfeiture by wrongdoing as well as admissibility under MCL 768.27b. We need not address whether the trial court properly applied the forfeiture by wrongdoing theory where MCL 768.27b allows for such testimony. Again, that statute provides:

> Except as provided in subsection (4) [conviction occurring more than 10 years before], in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other acts of domestic violence is admissible for *any* purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403. [Emphasis added.]

Looking to MRE 403, the "prejudicial effect of other-acts evidence did not stir such passion as to divert the jury from rational consideration of [defendant's] guilt or innocence of the charged offenses." *Id.* at 611-612. The trial court also "minimized the prejudicial effect of the bad-acts evidence by instructing the jury that the issue in this case was whether [defendant] committed the charged offense." *Id.* Juries are presumed to follow their instructions.

-15-

*Breidenbach*, 489 Mich at 13. Moreover, "any prejudicial effect of the trial court's decision to allow evidence of [defendant's] prior bad acts did not substantially outweigh the probative value of the evidence." *Cameron*, 291 Mich App at 612. Evidence of how defendant behaved on previous occasions with the victim was clearly relevant to the prosecution's theory that defendant acted intentionally.

### 3. DIANA BANKS-JOINER

The victim's aunt testified that she saw the victim suffer from a number of injuries once he began seeing defendant. Banks-Joiner testified that the victim told her that defendant had stabbed him in the abdomen and then sewn the wound shut with thread. Defendant casually noted that she had not intended to cut the victim that deeply. On another occasion, defendant punctured the victim's lung and recorded hospital footage of a doctor treating the victim.

Again, MCL 768.27b allows for such testimony.

### 4. SHEILA LORENZ

The victim's case manager testified that the victim showed her where defendant had stabbed him and sewn the wound. He also reported another incident where defendant stabbed him and he had to go to the hospital. The victim reported a third incident in which defendant hit him in the head with a hammer. Over objection, the trial court ruled: "There is a specific hearsay exception that deals with domestic violence that's specific to that. It certainly would I think allow the admission even though the declarant is unavailable, it was applied towards the course of this social worker's interaction with the decedent. The Court believes that that exception would cover that." The trial court was correct.

### 5. DETECTIVE SCHUETTE

Finally, defendant takes issue with Schuette's testimony regarding defendant's prior domestic violence acts in Ohio. We have already addressed this issue in Subsection II(C) of this opinion. There was no error.

### C. JUDICIAL BIAS

Defendant argues that the trial court was biased against her. The record does not support this contention.

"The question whether judicial misconduct denied defendant a fair trial is a question of constitutional law that this Court reviews de novo." *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015). At no time did defendant object to the conduct of which she now complains, nor did she seek to disqualify the trial court. The issue is, therefore, not preserved. *People v Jackson*, 292 Mich App 583, 597; 808 NW2d 541 (2011). Nevertheless, we have reviewed defendant's argument and find that there is no merit to her contention that the trial court was biased against her.

Our Supreme Court recently held:

-16-

A trial judge's conduct deprives a party of a fair trial if the conduct pierces the veil of judicial impartiality. A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party. In evaluating the totality of the circumstances, the reviewing court should inquire into a variety of factors including, but not limited to, the nature of the trial judge's conduct, the tone and demeanor of the judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions, either at the time of an inappropriate occurrence or at the end of trial. [*Stevens*, 498 Mich at 164.]

Defendant takes issue with the trial court's independent questioning of witnesses. We have reviewed these instances and find no fault with the trial court's involvement. We use the following as illustrations:

At the *Walker* hearing, while Detective Schuette was testifying, the trial court asked:

THE COURT: How long have you been a police officer for?

THE WITNESS: Since 1991.

THE COURT: Fair to say that you've had considerable contact with people that are under the influence of alcohol?

THE WITNESS: Yes, Sir, it is.

THE COURT: Did you feel comfortable even with a .18 that she understood what was happening?

THE WITNESS: Yes, Sir, I did.

And, when Schuette was testifying as to previous domestic violence charges against defendant being dropped because the victim refused to testify, the trial court asked:

THE COURT: . . .Is it an unusual dynamic in domestic violence cases when people have a relationship, either way for them to drop the charge or not want to cooperate?

THE WITNESS: No, Sir, it's actually quite common.

At the motion hearing to determine the admissibility of statements the victim made to his cousin, the court asked:

THE COURT: I'd just like to ask you a question so I can rule on the hearsay, were you concerned about his medical condition at the time?

THE WITNESS: Yes, Sir.

THE COURT: All right. Well, I'm gonna – I'm gonna rule that the hearsay is admitted for a non-hearsay purpose to show why the witness acted in the manner that she did responding to a concerned medical situation.

During the prosecutor's questioning of Detective Rose, the trial court asked:

THE COURT: Did the patterns of the blood dripping have any particular significance to you in your investigation?

THE WITNESS: At this point when I was taking the photographs it – its stated to me – it speaks that something occurred in the kitchen as – because of how the – the blood is running down on the refrigerator that the act and the height of the refrigerator, that it occurred sometime during an act of either being struck or stabbed with an item. I'm not a blood spatter expert so I can't tell you at what point that was caused by, but it's – it's higher off the ground and is running down the refrigerator.

When defense counsel was cross-examining a police officer regarding defendant's injuries at the time of her arrest:

*Q*. Did you check her teeth or her eyes?

*A*. I did not check her teeth, I did not notice anything of significance about her eyes. I didn't notice any injury to Ms. Gamet's face. The only injuries I noticed were the ones that I took photographs of on the hands and the abrasions on the knees.

THE COURT: And did she indicate at any time she was injured in any way?

THE WITNESS: No, she did not.

Upon questioning from the trial court, another officer testified that he was not surprised that the case against defendant was dismissed because the victim had written a letter indicating that he could not be sure that it was defendant that had hit him with a hammer. The trial court asked: "Is it unusual in domestic violence cases where people are involved in relationships, even if there is an incident of domestic violence, that later on the victim doesn't want to pursue prosecution?" When defense counsel questioned Detective Schuette about the fact that he was not a blood spatter expert, the trial court interjected: "Detective Schuette, you have been recognized by this Court and other courts for general crime scene analysis as an expert, correct?"

Judicial questioning of a witness is generally appropriate under MRE 614(b) to "prevent unnecessary waste of time, or to clear up some obscurity" but "the judge should bear in mind that undue interference, impatience, or participation in the examination of witnesses, or a severe attitude on the judge's part toward witnesses . . .may tend to prevent the proper presentation of

-18-

the cause, or the ascertainment of truth in respect thereto." *Stevens*, 498 Mich at 174. The above examples do not reflect partiality.

Defendant argues that the judge "failed to remain impartial by showing favor to the prosecution throughout the jury trial of the defendant by almost always ruling in favor of the prosecution" and that "it appeared as though the prosecutor and the trial court were working in union. Judge McBain repeatedly overruled the objections of defense counsel, often times wrongly quoting the Michigan Rules of Evidence in support of these rulings . . ." However, "[t]he mere fact that a judge ruled against a litigant, even if the rulings are later determined to be erroneous, is not sufficient to require disqualification or reassignment." *In re Contempt of Henry*, 282 Mich App 656, 680; 765 NW2d 44 (2009). We have already concluded that the trial court's admission and exclusion of evidence in this case was not an abuse of discretion.

We do acknowledge some intemperate remarks the trial court made during defendant's sentencing. During the sentencing hearing, defendant interrupted the victim's aunt, who was providing a victim impact statement. The trial court warned defendant to be quiet or he would have the court officer duct tape her mouth shut. The prosecutor noted: "[Y]ou and I both know how long I've been doing this and how many murder trials I've had, I have never had a convicted murder[er] stand before her court on the day of sentencing laughing and lip jacking anybody who will listen, including you. . . .I can't believe she stands before you doing this this morning." The trial court indicated:

> And you know what, I's [sic] the only one in the courtroom that knew what kind of knife that was. And it was a big old long filet knife. Because I – I use it to – I used to filet pike and muskie and salmon, and I'll tell you, you gutted him like a fish in that apartment too. You were relentless. You stabbed, you stabbed, you stabbed, you stabbed, you stabbed until he was dead.

> You didn't think he was an intruder. You know, maybe one stab wound, okay. Maybe that's self-defense, but you – you put in 11 more to make sure he was good and dead. So I hope – I agree with the family, I hope you die in prison as well. You know, and if this was a death penalty state you'd be getting the chair.

"Comments that are critical of or hostile to counsel and the parties are generally not sufficient to pierce the veil of impartiality." *Jackson*, 292 Mich App at 598. Moreover, these comments were made at defendant's sentence. The trial court could not have deprived her of a fair trial because the comments were made only after the jury handed down its verdict.

D. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant claims that she received ineffective assistance of counsel at trial. We disagree.

"[A] defendant must move in the trial court for a new trial or an evidentiary hearing to preserve the defendant's claim that his or her counsel was ineffective." Because defendant did

not move for a *Ginther*[6] hearing, our review is limited to "mistakes apparent from the record." *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012).

> A criminal defendant has the fundamental right to effective assistance of counsel. However, it is the defendant's burden to prove that counsel did not provide effective assistance. To prove that defense counsel was not effective, the defendant must show that (1) defense counsel's performance was so deficient that it fell below an objective standard of reasonableness and (2) there is a reasonable probability that defense counsel's deficient performance prejudiced the defendant. The defendant was prejudiced if, but for defense counsel's errors, the result of the proceeding would have been different. [*Id.* (internal footnotes omitted).]

"A defense attorney must enjoy great discretion in the trying of a case-especially with regard to trial strategy and tactics." *People v Pickens*, 446 Mich 298, 330; 521 NW2d 797 (1994). "Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v Solmonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004). "Decisions regarding what evidence to present, whether to call witnesses, and how to question witnesses are presumed to be matters of trial strategy." *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212(2008).

Defendant argues that defense counsel was ineffective in the following ways: (1) failing to properly prepare for trial; (2) indicating that defendant did not know who her attacker was during opening statements[7]; (3) failing to advise defendant that statements she made to a private investigator were not protected by the attorney-client privilege; (4) failing to obtain defendant's cell phone records to disprove the prosecutor's claims that defendant tried to coerce the victim into recanting his claims after the hammer incident; (5) failing to properly impeach witnesses; (6) failing to locate additional witnesses; (7) advising defendant to testify that she did not know who her attacker was in spite of counsel's knowledge of defendant's mental health issues; (8) advising defendant to testify that she did not defraud the state by claiming to be the victim's chore provider; (9) failing to prepare defendant to testify; (10) failing to ask defendant about the events at Jack's Bar that preceded the attack; (11) failing to subpoena defendant's mental health records; (12) failing to subpoena the victim's medical records to determine the extent of his

---

[6] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[7] Defense counsel in opening admits that the two were fighting that night, that defendant was passed out, and that the victim took a glass table and smashed it into her head. Defendant tried to reach for the lamp, which was the only light source, but it fell apart in her hands. "While this was happening in a pitch dark room she was being pummeled by persons unknown. Maybe it was Mr. Hill, maybe it was somebody else." Defendant struck her attacker several times with the lamp and then felt a knife on the table. "But she didn't know who it was. It could have been Marcel, it could have been some other intruder." Defense counsel argued that, rather than first degree murder, defendant was guilty of only manslaughter and self-defense.

physical and mental disabilities; and, (13) failing to subpoena the victim's SSI and bank records to defend against the claim that defendant had defrauded the system.

We have reviewed each of these instances of alleged error and conclude that defendant's claim lacks merit. We hold that defendant has failed to overcome the presumption that defense counsel's actions were the result of sound strategy. As for defendant's claim that defense counsel advised her to perjure herself, we require more than defendant's bare assertion that counsel behaved so grievously. Moreover, as noted above, the evidence against defendant was overwhelming. Therefore, to the extent counsel's actions fell below the objective standard of reasonableness, defendant has not shown that the errors prejudiced her.

## E. JURY INSTRUCTION

Defendant argues that the trial court erred in failing to instruct the jury on manslaughter. We have already concluded that there was no error in subsection II(A) of this opinion.

Affirmed.

/s/ Mark T. Boonstra
/s/ Kirsten Frank Kelly
/s/ Christopher M. Murray